Edward O. Tudor, as Successor Trustee, Appellee, v. Russell Firebaugh, Individually and as Alleged Trustee, et al., Defendants. Bessie Brody, Individually and as Owner and Holder of Bonds Secured by Trust Deed Foreclosed Herein, et al., Appellants.

Gen. No. 40,643.

Heard in the third division of this court for the first district at the April term, 1939. Opinion filed February 14, 1940.

WHITTY & McGAH and ABRAMS, SHERMAN & LEWIS, all of Chicago, for appellants; LOUIS A. SHERMAN and IRVING S. ABRAMS, of counsel.

ARTHUR ABRAHAM, of Chicago, for appellee.

* See Callaghan's Illinois Digest, same topic and section number.

Mr. Presiding Justice Denis E. Sullivan delivered the opinion of the court.

The record and facts in this case are similar to the record and facts in the case of *Tudor v. Firebaugh*, 303 Ill. App. 452, and the views expressed in that case apply with equal force to the instant case. Therefore, the decree of the superior court of Cook county is accordingly reversed and the cause is remanded.

*Decree reversed and cause remanded.*

Hebel, J., concurs.

Burke, J., dissenting: On May 19, 1927, Axel G. Johnson and Ella S. Johnson, executed a trust deed to Russell Firebaugh, as trustee, to secure the payment of 206 bonds in the aggregate sum of $93,000, the last bond of the series maturing May 7, 1934. The trust deed conveyed the real estate and improvements commonly known as the Laurelwood Apartments, located at 4832–34 North Lincoln street, Chicago. The trustee filed a bill of complaint on the chancery side of the superior court of Cook county alleging various defaults. On April 23, 1931, the superior court of Cook county entered a decree of sale. The decree found that bonds Nos. 1 to 21, inclusive, had been paid; that there was a balance due on bonds Nos. 22 to 206, inclusive, of $82,500; that a reasonable and customary solicitor's fee would be $4,000, and that all items, together with interest, totalled $91,696.33. The decree directed that a master in chancery sell the property. On May 15, 1931, the premises were offered for sale by the master. Russell Firebaugh, as trustee, bid in the property for the benefit of all the owners and holders of the outstanding bonds. The sale was confirmed by the court and a certificate of sale issued to Russell Firebaugh, as trustee. On August 16, 1932, the master issued to Firebaugh a master's deed in the usual form. During the pendency of the foreclosure proceeding and thereafter Firebaugh was in possession of the premises and

collected the rents, issues and profits, made disbursements and operated the premises. At the time the sale was confirmed, no plan of reorganization was presented to the court and no plan had been presented to the bondholders. E. Ray Grant became successor trustee and on August 20, 1934, filed an original complaint in the superior court, praying for the approval of his accounts and the declaration and interpretation of the terms of the trust upon which he held title to the premises, and for an accounting against Russell Firebaugh. While the latter complaint in chancery was pending, and on December 7, 1934, E. Ray Grant resigned as successor trustee, and the Consolidated Bondholders' Committee, holders of a substantial amount of bonds secured by the trust deed, petitioned the court for the appointment of a successor trustee, alleging that a majority of the bondholders had failed to appoint a successor trustee. The court entered a decree on February 13, 1935, and appointed Edward O. Tudor as successor trustee. The decree approved the accounting of E. Ray Grant and directed that Russell Firebaugh execute a quitclaim deed to the successor trustee. The last paragraph of the decree provided that "this court retains jurisdiction of the Successor Trustee and of the premises above described and of the parties hereto for the purpose of further instructing said Successor Trustee in the administration of his trust; that the ultimate and net proceeds from the operation, leasing, encumbrance or sale of said premises shall be held for the benefit of the holders of the outstanding bonds and interest coupons described in and secured by that certain Trust Deed from the said Axel G. Johnson and Ella S. Johnson, his wife, to Russell Firebaugh, as Trustee, dated May 19th, 1927, and recorded in the Recorder's Office of Cook County, Illinois on May 28th, 1927, as Document No. 9668124; but that the interest of the holders of said bonds and interest coupons shall consist solely of an interest in

and to the proceeds from the administration or disposition of said premises, and shall constitute solely personal property and the holders of said bonds and interest coupons shall have and do have no right, title or interest in or to said premises above described or any part thereof.'' The complaint on which the decree is based, is not in the record. It appears that the complaint was filed as a class or representative action. The decree finds that the proceedings were brought in behalf of all the bondholders, and that there was no conflict of interest. The decree also finds that the owners and holders of the outstanding bonds and interest coupons are numerous and widely scattered, many of them residing outside of the State of Illinois and in distant parts of the United States; that the addresses of some of the owners of the bonds are unknown; that service upon many of the bondholders would be difficult and impossible to obtain; that Louis Nelson, William G. Heidemann, Herman Weiss and Oliver J. Wescott, members of a certain Bondholders' Protective Committee for bonds purchased from the Maywood State Bank and Melrose Park State Bank, Charles H. Slocum, Anthony K. Warner, Charles Schutt and Ida Wagner, members of a certain committee styling themselves, ''The Bond & Mortgage Bondholders' Committee,'' John W. Guskay, Philip T. Waldbillig, William Kessler and Harry L. Randall, as members of a Bondholders' Protective Committee, and John Herold, William Mohns, Charles L. Schutt, Charles H. Slocum, Dr. I. S. Trostler and Dr. William H. Meyer were holders of a substantial amount of bonds; that the named persons had interests alike in all respects to the interest of all the bondholders and interest coupons, and that they ''now represent all of the holders and owners of said bonds and interest coupons.'' No appeal was prosecuted from the decree entered on February 13, 1935. Firebaugh delivered a deed conveying the property to the successor trustee in accordance with the directions of the decree.

On April 29, 1936, Edward O. Tudor, the successor trustee, filed his petition in the superior court of Cook county in the same case in which the decree of February 13, 1935, was entered. The petition recited that in the decree the court reserved jurisdiction of the successor trustee and of the premises for the purpose of further instructing the successor trustee in the administration of his trust; that various questions had arisen in connection with the administration of the trust; that he believed the court should determine some definite plan of reorganization, setting out the rights, powers and duties of the successor trustee in connection with the trust and providing for the issuance of certificates of beneficial interest to the bondholders in lieu of their bonds, and "providing for some inspection and examination of the operations of the trust by representatives of the bondholders"; and prayed that the court instruct him with respect to his rights, powers and duties in the premises; that the court determine a plan for the exchange of bonds for certificates of beneficial interest. The petition also stated that certain taxes remain unpaid against the premises, and that suggestions had been made by various bondholders that money should be borrowed upon a first mortgage on the premises in order to pay the taxes and costs of administration, and asked the instruction of the court on such matters, and prayed that the court determine his fees and expenses and the fees of his attorney. On April 29, 1939, an order was entered on motion of the successor trustee, giving him leave to file the petition and giving leave to John W. Guskay, William Kessler, John Brown, Charles Schutt, Louis Nelson and Francis McGovern, comprising a certain Consolidated Bondholders' Committee, to file their answer instanter, and referred the cause to a master in chancery for the purpose of taking proofs and reporting his conclusions of law and fact. The answer of the individuals comprising the Consolidated Bondholders' Committee, was filed the follow-

ing day, and admits that the court should instruct the trustee with respect to his rights and duties in the administration of the trust, that the specific powers of the trust be defined, that specific machinery for the conduct and supervision of the trust should be set up, and that the fees and costs of the respondents in connection with the procuring of the bonds, representation of the bondholders and service of the committee in connection therewith, should be fixed and allowed by the court to be paid out of the proceeds of the reorganization mortgage. On October 4, 1938, the trustee presented the master's report and asked that a decree be entered in accordance with the recommendations therein. The motion was continued until October 14, 1938, and all parties in interest were given leave to file objections or exceptions to the report before October 14, 1938. On October 13, 1938, Bessie Brody, the owner of bonds Nos. 74, 75, 76, 77, 175 and 176, and Louis E. Nelson, William G. Heidemann, Herman Weiss and Oliver J. Wescott, members of a certain Bondholders' Protective Committee for bonds purchased from the Maywood State Bank and Melrose Park State Bank, and John T. Brown, John W. Guskay, Louis E. Nelson, Charles L. Schutt, Francis W. McGovern and William A. Kessler, constituting the Consolidated Bondholders' Committee, filed exceptions to the master's report. The master reported that pursuant to the order of reference and to due notice given, he took testimony, and he recommended that the interest of the bondholders shall constitute a beneficial interest in the net income, proceeds and avails which may come into the hands of the trustee through leases, sales assignments or other dispositions, conversions or uses of the trust property, or any part or parts thereof in the proportion which the number of units held by each certificate holder shall bear to the total number of units outstanding; recommended the approval of the plan of reorganization; that certif-

icates of beneficial interest shall be equivalent to one unit for each $100, principal amount of bonds; that the certificates shall provide that the holder thereof has no claim or interest, legal or equitable, in any of the real estate, but only an interest in the net income, proceeds and avails thereof. The master further recommended that the attorney for the receiver was entitled to the sum of $5,000 as the reasonable sum for his services which were necessary to be performed in order to successfully conclude the proceedings; that the Consolidated Bondholders' Protective Committee be paid $2,500 as the reasonable value of services rendered and to be rendered in connection with the reorganization plan; that the successor trustee be granted the sum of $1,000 as the reasonable value of the services to be performed by him, and that the court retain jurisdiction of the cause for the purpose of further instructing the successor trustee with respect to his rights, powers and duties. We will discuss the exceptions in connection with the points made by appellants.

On October 18, 1938, after the exceptions had been fully argued, the court entered a decree finding that it was to the best interests of the holders of bonds to reorganize the property and to further define the rights, powers and duties of the trustee with respect to the administration of the trust; that the trustee has acquired the fee simple title to the real estate; that the interest of the certificate holders shall constitute a beneficial interest in the net income, proceeds and avails which may come into the hands of the trustee through leases, sales, assignments or other dispositions, conversions or uses of the trust property, or any part or parts thereof in the proportion which the number of units held by each certificate holder shall bear to the total number of units outstanding; that the certificate holders shall not be considered as partners; that subject to limitations set out, the trustee shall have power to sell and convert the property into

474

cash or other personal property, and to distribute the net proceeds to the beneficiaries to manage, operate, improve, protect and maintain the property; to sell, exchange, convey, mortgage, pledge and incumber the property; that the trustee shall not sell any of the trust property, issue trust deeds, mortgages or pledges, or exercise any trust powers other than in the operation of the premises in the usual course of business without the consent in writing of the majority of the ·trust managers, or 51 per cent of the amount of the outstanding certificate holders; that the trustee shall submit accounts of receipts and disbursements monthly to each of the trust managers; that expenditures of over $100 shall be made only upon competitive bidding after notice to the trust managers; that the trust managers shall have access to the books of the operation of the trust, and the beneficiaries shall be furnished with a summary statement at least once every six months; that there shall be issued to the holders of the bonds, certificates of beneficial interest evidencing the interest in the trust in an amount equivalent to one unit for each $100, principal amount of bonds held, upon the surrender and cancellation of the bonds and interest coupons attached; that the certificates shall have a clause whereby the holder agrees that he has no claim or interest, legal or equitable, in any of the property, but only an interest in the net income, proceeds and avails thereof; that the trustee shall maintain a register for the purpose of showing the ownership of the certificates and transfers thereof; that the trustee shall establish reserves from the income and shall make distribution to the certificate holders semimonthly at the written request of a majority of trust managers or the holders of 51 per cent in the amount of the outstanding certificates; that the trustee shall furnish a bond; that the trustee shall keep books; that John W. Guskay, John T. Brown and William A. Kessler shall be the trust managers; that the trustee, trust

managers, or any part of them, may be removed for cause by demand in writing of 51 per cent of the outstanding certificate holders; that the trust may be terminated or amended after 20 days' notice to the trustee, the trust managers and the certificate holders, by instrument in writing duly executed by the holders of 66⅔ per cent of the outstanding certificates, and if not sooner terminated, by the liquidation of the trust property, shall terminate at the expiration of 15 years from the date hereof, at which time the trust property shall be sold by the trustee at public auction after 90 days' notice in writing given by registered mail to all of the certificate holders and trust managers; that the trustee shall receive as compensation 5 per cent of the gross rentals realized from the operation of the trust property, and each of the trust managers the sum of $50 annually as his compensation; that the attorney for the trustee be paid $2,500 as the reasonable value of the services rendered by him; that the attorneys for "a certain Bondholders' Protective Committee for bonds purchased from the Maywood State Bank and Melrose Park State Bank, and John T. Brown, John W. Guskay, Louis E. Nelson, Charles L. Schutt, Francis W. McGovern and William A. Kessler, constituting the Consolidated Bondholders' Committee," be paid $500 for their services; that John W. Guskay, William A. Kessler, John T. Brown, Charles L. Schutt, Louis E. Nelson and Francis W. McGovern, comprising the Consolidated Bondholders' Protective Committee, be paid the sum of $1,250 for services rendered in the proceedings; that the successor trustee be paid $500 as the reasonable value of the services he rendered; that the master be paid $116.50 as his fee; that the fees so ordered paid and the general taxes be paid out of the proceeds of the reorganization mortgage, to be placed upon the premises; that the trustee be authorized to negotiate a first mortgage for a sum sufficient to pay the fees, costs and general taxes; that upon the prep-

aration of the reorganization mortgage, the same is to be presented to the court for approval; that Russell Firebaugh, former trustee, account to the court for all moneys received and all disbursements made from the premises described, within 20 days, and that the court retain jurisdiction for the purpose of further instructing the trustee with respect to his rights, powers and duties in the premises. Bessie Brody, individually and as owner and holder of bonds secured by the trust deed foreclosed, Louis Nelson, William G. Heidemann, Herman Weiss and Oliver J. Wescott, members of a certain Bondholders' Protective Committee, and John T. Brown, John W. Guskay, Louis E. Nelson, Charles L. Schutt, William A. Kessler and Francis W. McGovern, constituting the Consolidated Bondholders' Committee, prosecute this appeal from the decree of October 18, 1938.

Except for Bessie Brody, the parties who are prosecuting this appeal, constitute the same bondholders' committee which filed an answer to the petition, and which answer admitted that the court should instruct the successor trustee with respect to his rights and duties in the administration of the trust; that specific machinery for the conduct and supervision of the trust should be set up and that the fees and costs of the committee should be fixed and allowed and made a part of the reorganization mortgage. It is worthy of note that John T. Brown appeared before the master and testified in behalf of plaintiff that he was the chairman of the Consolidated Bondholders' Committee, the holders and owners of a substantial number of bonds; that he and other members of the committee made a careful investigation as to a plan of reorganization by which the property could be operated for the benefit of the bondholders; that the plan of reorganization presented to the master outlined an adequate and approriate plan for the reorganization of the property and contained a ''proper interpretation of the powers

and duties of the successor trustee''; that the plan was adequate, workable and reasonable and gave the bondholders full and complete protection; that it was necessary for the court to take jurisdiction in order to define the rights, powers and duties of the successor trustee and to protect the interest of the bondholders; that there was a forfeiture on account of the general taxes for 1927; that the sum of $1,487.63 remains unpaid on the 1930 taxes; that the taxes for 1931 are unpaid; that there is a balance unpaid on the 1932 taxes of $1,240.47; that there is an unpaid balance of $695.60 on the general taxes for 1933; that there is an unpaid balance of $1,208.47 on the general taxes for 1934; that the general taxes for 1935 were unpaid; that the bills for the 1935 taxes had not then been issued; but that the taxes would amount to $1,400; that in addition to the amounts due on the taxes, the county collector would add 12 per cent per year as a penalty; that the committee could procure a loan; that it was desirable that a liquidating loan be made for the purpose of paying the taxes in order to stop the accumulation of penalties; that since May, 1932, there had been no distribution of any sort to the bondholders, and he also testified as to reasonable fees for services rendered by the Consolidated Bondholders' Committee. He presented a plan of reorganization, which was received in evidence. He appeared for the committee at the hearing. He stated that the committee had given careful consideration to the plan of reorganization which set out the terms and limitations defining the powers of the successor trustee, and that the plan provided for a liquidating trust which would be fair to all parties. The record does not show that any objections were filed before the master. When the master's report was presented, leave was granted to the Consolidated Bondholders' Committee and to Bessie Brody to file exceptions. Bessie Brody and the various committees filed joint exceptions, and in so doing were

represented by the same attorney. There was a full hearing before the court. One of the exceptions was that the master failed to give counsel notice of the hearings. We do not know what evidence or statements were introduced before the chancellor as to whether notice had been given. All presumptions are in favor of the validity of the decree and the burden is on anyone who objects to support such objections by reference to the record. No record has been certified as to what was said or introduced before the chancellor. It must be assumed that he acted on proper evidence or stipulations. Another objection is that a bondholder had commenced a suit for partition which was then pending in the superior court of Cook county. According to the argument presented in the brief, the partition suit was commenced by Bessie Brody. Our attention has not been called to any part of the record which discloses anything about the partition suit, except the mere statement in the exceptions that such a suit was pending. Bessie Brody did not ask leave to file a pleading of any kind. The Consolidated Bondholders' Committee did not ask leave to amend the answer. Hence, their exceptions are inconsistent with their own answer. Mr. Brown, chairman of the bondholders' committee, as a witness before the master, urged the approval of the plan of reorganization, which is now being attacked. No good reason has been vouchsafed to us as to why the members of the Bondholders' Protective Committee changed their attitude from one of urging the court to assume jurisdiction and to approve the plan, to one of antagonism to the approval of the plan. The appellants did not produce, or offer to produce, any other plan and did not offer any amendment to the plan proposed. If the objectors had any constructive ideas as to a better way of reorganizing the property, they did not disclose them to the court. It is difficult for us to understand how the members of the bondholders' committee can

now take a position which is entirely at variance with the position they took in the superior court. It also appears that Bessie Brody and the members of the bondholders' committee were given a full hearing before the chancellor.

Appellants urge that the provisions of the trust deed constitute the charter of the trustee's powers and duties; that only when there is some reasonable doubt as to the powers or duties or rights of parties interested, is the trustee entitled to the court's direction, and that equity cannot create a trust over the objections of the *cestui que trust*. The parties admit that the trustee had the power to bid in the property at the foreclosure sale for the benefit of all the bondholders. It has been held that where the trustee has power under the terms of the trust deed to bid in the property for the benefit of all the bondholders, he holds upon an active trust. It is well settled that a court of chancery in the exercise of its general equity powers may pass upon the fairness of a plan of reorganization. As a general rule, such a plan is passed upon before the sale is confirmed. No explanation has been given as to why a plan of reorganization was not submitted to the bondholders before the real estate was sold. In *First Nat. Bank of Chicago v. Bryn Mawr Beach Bldg. Corp.*, 365 Ill. 409 (opinion filed February 12, 1937), the Supreme Court, at page 416, said:

"Until about twenty years ago the courts of this country were uniform in the view that they had no concern with the business of a re-organization of bond or debt-encumbered properties of a corporation, but it was thought that the sole function of equity courts was, through receiverships and injunctions, to supervise the assets pending sale or liquidation, as the creditors might determine, and to sell the property at foreclosure sale for what it might bring. During the last twenty years, however, Federal courts have been of the view that equity jurisdiction does extend to the

examination and approval or disapproval of proposed plans of re-organization. It is true that in most of the cases, such as *Kansas City Terminal Railroad Co. v. Central Union Trust Co.* 271 U. S. 445, 70 L. ed. 1028, *Louisville Trust Co. v. Louisville, N. & A. R. R. Co.* 174 U. S. 674, 43 L. ed. 1130, and *Guaranty Trust Co. v. Missouri Pacific Railway Co.* 238 Fed. 812, jurisdiction has been taken on the ground that the defaulting mortgagor was a railroad or other public utility, and that the public interest was sufficient to justify a court of equity in taking jurisdiction of a plan to keep such utility in operation. The equitable jurisdiction of Federal courts has not, however, been limited solely to cases where utilities were involved, as is shown by *Bethlehem Steel Co. v. International Combustion Engineering Corp.* 66 Fed. (2d) 409, *Graselli Chemical Co. v. Aetna Explosives Co.* 252 Fed. 456, and like cases, where a court of equity has taken jurisdiction to consider the means by which re-organization of private corporations was sought to be effected and to approve or disapprove the same and the foreclosure sale had in connection therewith. In these cases it has been recognized that where large properties, as to which rights and relations are complicated, are sold at foreclosure sale, such sale, disconnected with a plan of re-organization, is likely to prove disastrous, as it rarely obtains for the property any approach to a fair price and often enables a financially strong group to gain by combined action an unfair advantage over those who do not have the means to protect the sale. And so these courts of equity have withheld the sale of the mortgaged property under the protection of possession by a trustee or receiver appointed by the court or acting under the terms of the trust deed, until such time as a sale might be had as a step in the re-organization of the concern. For this purpose the court takes jurisdiction to consider the fairness of the plan proposed. This, as we understand it, has been

the underlying purpose of the exercise of equitable jurisdiction in cases of this character. *First Nat. Bank v. Flershem,* 290 U. S. 504, 78 L. ed. 465; *National Surety Co. v. Coriell,* 289 U. S. 426, 77 L. ed. 1300; *Habirshaw Electric Co. v. Habirshaw Electric Cable Co. Inc.* 296 Fed. 875.

"It is not pointed out wherein equity jurisdiction and powers of State courts are to be considered more limited or restricted than those of the Federal courts." The real estate in the instant case was sold by the master and the approval of the chancellor asked thereon. The court in entering the decree appealed from, was facing a situation and not a theory. The successor trustee had title to the property. It is well known that there has been little if any market for the sale of such properties in the past 10 years. None of the objectors has stated that anyone is offering to purchase the property. Without the decree of court, the duties of the trustee are not defined, nor is there any provision as to when the trust terminates. The Supreme Court has held that it is proper for the court to pass on a plan of reorganization prior to the confirmation of the sale. Where the sale has been conducted and the deed issued to a trustee, we do not know of any good reason why a court of equity does not have equal power at that time to approve a plan of reorganization and instruct the trustee as to his duties. Rules of equity jurisdiction have developed and are developing. All who are conversant with the history of equity jurisprudence know that as a distinct system it has been of constant growth and development from its inception. In *Dodge v. Cole,* 97 Ill. 338, the Supreme Court said: "The jurisdiction of a court of equity does not depend upon the mere accident whether the court has, in some previous case or at some distant period of time, granted relief under similar circumstances, but rather upon the necessities of mankind, and the great principles of natural justice, which are recog-

nized by the courts as a part of the law of the land, and which are applicable alike to all conditions of society, all ages, and all people.'' We conclude that under the factual situation confronting the chancellor he had the right to approve a plan of reorganization and to enter a decree defining the rights and duties of the successor trustee and bondholders.

Another point insisted upon by appellants is that by virtue of the partition suit filed by Bessie Brody in the superior court on September 16, 1937, that court acquired jurisdiction of the subject matter involved in the instant cause, and that hence the chancellor had no power to enter the instant decree. No pleading was filed, setting up the pendency of a prior action. All that the record discloses as to the other case is set out in exception No. 8, stating that ''these objectors had commenced a suit for partition now pending in the Superior Court of Cook County, Illinois, as case No. 37S 11513, in which she alleged to be part owner of said premises.'' No citation of authority is required for the proposition that matter in abatement must be pleaded in the trial court. Appellants brief states that the partition suit was filed on September 16, 1937. The petition in the instant case was filed on April 29, 1938, prior to the filing of the partition proceeding. It is not contended that any decree has been entered in the partition suit. The pendency of a prior suit, if it constitutes a defense, must be pleaded in abatement. We must remember that the decree of February 13, 1935, finds that the interests of the bondholders constitute personal property, subject to an express trust. No appeal was prosecuted from that decree. The decree in the instant case also provides that the interest of the certificate holders shall constitute personal property and not an interest in real estate. In the case of *Aronson v. Olsen,* 348 Ill. 26, the court said, p. 28:

''By the deed of trust the entire legal and equitable title to the property was expressly vested in the trus-

tee, and the interest of each and every beneficiary, and of all persons claiming under them, was declared to be personal property. Under this agreement it was expressly stipulated that no beneficiary should have any right, title or interest in or to any portion of the real estate. The defendants in error had, therefore, no such interest in the land, either legal or equitable, as would authorize them, as beneficiaries under the trust, to a partition of the premises. *Whitaker v. Shearer,* 313 Ill. 473; *Duncanson v. Lill,* 322 id. 528; *Ward v. Williams,* 282 id. 632; *Williams v. Wiggand,* 53 id. 233.'' In *Harris v. Ingleside Bldg. Corp.,* 370 Ill. 617, 623, the court said:

''An equitable title, however, does not necessarily mean that it may be partitioned, because there are many situations where it is refused from equitable considerations. For example, a title held subject to an active trust, (*Burbach v. Burbach,* 217 Ill. 547,) or legal or equitable titles held upon an agreement not to partition.'' I am of the opinion that the court had the right to declare the interest of the certificate holders to be an interest in personal property and not in real estate.

If a bondholder or a group of bondholders sought to partition the property, we know that the property would then have to be sold at a judicial sale. Yet, the title now vested in the trustee was acquired through a judicial sale. Presumably, the property would be bid in for the benefit of the depositing bondholders. The nondepositing bondholders would then receive their share of the amount for which the property was sold, which, in all probability, would be only a few cents on the dollar. Without the provision that the certificate holders do not have an interest in real estate, many difficult problems would arise, such as petitions to partition, following the devolutions of title to a fractional undivided part to a multitude of heirs, and other like problems. By the necessity of the situation, the action of the court in declaring that the

interest of a certificate holder is an interest in personal property only, was in accordance with equitable principles. The case of *Ashton v. Macqueen,* 361 Ill. 132, relied on by appellants, is not applicable to the facts in the case at bar. The decree entered on February 13, 1935, from which no appeal was prosecuted, was a representative suit and was binding on all of the bondholders.

The chancellor had the power to pass on the plan of reorganization. He considered that the plan was fair. Appellants in their statement of facts say that under the decree of October 18, 1938, the interest of the bondholders is in the income only. An examination of the decree discloses that the bondholders were entitled to all the net income, proceeds and avails from sales and other dispositions of the property. It is clear, therefore, that the certificate holders will be entitled to the net income and to their proportionate share of the proceeds and avails from a sale or other disposition of the property. The tax situation is deplorable. No attack, however, is made on the integrity of the successor trustee. In the decree the court directed the original trustee to make an accounting within 20 days. From a careful consideration of the record and of the points presented, we cannot hold that the chancellor abused his discretion in approving the plan. Criticism is also leveled at the fees that were allowed. No complaint is made as to the amount of the fees, providing any fees are allowed. It is well settled that fees may be allowed to a trustee or his attorney where it is necessary to file a complaint for the purpose of construing the trust. The trust deed covering the mortgage on the property in question expressly provided that the trustee should be allowed compensation for himself and his attorney and also for all proper outlays. There was testimony before the master as to the reasonable value of the services rendered by the trustee, the attorneys and the committees, and we are

unable to say that the court was wrong in accepting such testimony and entering a decree in accordance therewith.

We observe that the plan of reorganization contemplates that the trustee may be removed on the vote of 51 per cent in amount of the certificate holders. The court would nevertheless have the power of removing the trustee for cause regardless of whether a majority of the certificate holders demanded such removal. A court of equity has the inherent right to remove a trustee where he is dishonest or incompetent. Under the decree appealed from, the court retained jurisdiction to further instruct the trustee with respect to his rights, powers and duties in the premises. Should any certificate holder have good ground to believe that the property was not being honestly and capably managed, he would have the undoubted right to file a petition in the same cause, asking to be heard with respect to his grievances. Should any certificate holder wish to call to the attention of the court the fact that any person or corporation was ready to make an offer to purchase the property, the chancellor would have the power to bring before him the trustee and certificate holders and all other necessary parties for the purpose of determining whether it would be for the best interests of the certificate holders to sell the property. It follows that the chancellor would also have the right to decide that the property should not be sold if he deemed the terms unfavorable to the certificate holders.

Finally, it is argued that the provisions of the decree directing the issuance of certificates of beneficial interest are in violation of section 77C, 15 USCA sec. 3, of the Federal Securities Act of 1933. I am of the opinion that under the circumstances disclosed by the record, the issuance of the certificates does not constitute a violation of the Federal Securities Act of 1933.