MERCHANTS' LOAN & TRUST CO. et al. v. CHICAGO RYS. CO. (three cases).

(Circuit Court of Appeals, Seventh Circuit.   September 7, 1907.)

Nos. 1,415–1,417.

1. RAILROADS—FORECLOSURE OF LIENS—POWER OF COURT TO DISPLACE.

A court which has by its receivers taken possession of railroad property, of either steam or street railroad companies, has no power to displace vested contract liens thereon except in favor of the comparatively small claims for operating expenses which under. the rule of the Supreme Court are entitled to equitable priority or similar claims represented by receivers' certificates issued to keep the property in operation or in operative condition.

2. STREET RAILROADS—REORGANIZATION SCHEME.

A court is without power to direct its receivers in possession to lease the properties of street railroad companies, having more or less relation to each other, for a term of years to a single reorganized company, and to authorize such company to issue mortgage bonds to an indefinite but necessarily large amount to cover the cost of replacing, re-equipping, extending, and improving the properties under the direction of a board of engineers representing the city and not the owners, and to. make such mortgage a first lien, over the objections of prior mortgagees whose liens are thereby displaced.

Appeals from the Circuit Court of the United States for the Northern District of Illinois.

These appeals were taken from the order entered the 12th day of August, 1907, in the matter of the petition of the Chicago Railways Company filed in the three cases of the Guaranty Trust Company of New York, one against the Chicago Union Traction Company et al., another against the North Chicago Street Railroad Company et al., and the third against the West Chicago Street Railroad Company et al., reported in 158 Fed. 913. The order entered by the Circuit Court contained these specific findings:

And it appearing to the court that the rights of the owners of a large portion of the lines of street railway operated by the receivers of the Chicago Union Traction Company under ordinances from the city of Chicago have expired, that the rights of a considerable portion of said lines will expire from time to time at short intervals from and. after March 1, 1908, and that .the rights with respect to a considerable portion. of said lines are subject to be terminated by the city at any time on six months' notice and upon purchase of the tangible properties of said companies, respectively;

And it further appearing to the court that the said properties are and have been for several years past so commingled and connected that it is impracticable to separate them without great loss to all parties in interest;

And it further appearing to the court that Chicago Railways Company has promulgated a plan of reorganization and readjustment in accordance with the provisions of the ordinance of the city of Chicago passed on February 11, 1907, under which plan an opportunity is conferred upon each individual holder of a direct or indirect interest in or lien upon said property, franchises, or claims, or any part thereof, or of any right, claim, or demand as creditor, or otherwise, entitled to enforcement against such property, franchises, rights or claims, or payable out of any part thereof, to participate in the transfer of

said property, franchises, rights, and claims to and the acquisition thereof by the said company, and to receive such stocks, securities, or other benefits as said plan of reorganization and readjustment may provide, on the terms and conditions in said plan set forth, which plan has been approved by Peter S. Grosscup and by John C. Gray, in accordance with the provisions of the deposit agreement annexed to said ordinance marked "Exhibit D"; copies of which ordinance, plan, and approval have been filed with this court in these causes;

And it appearing to the court that unless said plan and agreement be availed of, and the Chicago Railways Company be vested with possession of the lines of street railway above referred to on or before the 15th day of September, 1907, the right to avail of said ordinance will terminate, and great loss will ensue to the holders of all liens upon, claims against, or interests in the said property, and that in view of such exigency this order should be made;

And it further appearing to the court that all of the said lines of street railway and the property connected therewith are held and operated under statutes of the state of Illinois and ordinances of the city of Chicago, subject to the obligation that adequate street railway transportation and service shall at all times be furnished thereby to the public, and that the rights of all of the parties to this cause and of those claiming by, through or under them, respectively, are held subject to such obligation;

And it further appearing to the court that the present condition of the said lines of street railway and their equipment and the property connected therewith is not such as to enable adequate street railway transportation and service to be rendered to the public by means of the said street railways, or any part thereof, and that unless such adequate street railway transportation and service is promptly and continuously rendered, the right to maintain and operate the said lines of street railway will be terminated to the great loss and injury of all of the parties to this cause and of all those who claim by, through, or under them, or any of them;

And it further appearing to the court that, in order to enable the said lines of street railways and property to be so maintained and operated as to furnish adequate street railway transportation and service to the public, it will be necessary to reconstruct, re-equip, and rehabilitate the said lines, and in general to comply with the provisions of the ordinance of the city of Chicago passed on February 11, 1907, to the Chicago Railways Company, in respect thereto;

And it further appearing to the court that it is impossible to procure the necessary means to enable the said street railway system to furnish adequate street railway transportation and service to the public, except by procuring a loan of sufficient funds to pay the cost of necessary construction, reconstruction, equipment, re-equipment, extensions, and additions, and that such moneys can only be obtained by means of a loan secured by a lien superior to the liens of all and every the existing mortgages on said system of street railways, or any part thereof, and to all and every the liens now existing upon the said system of street railways, or any part thereof, in favor of any party to any of the above-entitled suits, or those claiming by, through or under any such party;

And it further appearing that there have been deposited with the Chicago Title & Trust Company, as trustee, under the provisions of said ordinance and of Exhibit D thereto attached, the following numbers of shares of the capital stock of the following companies, respectively, to wit:

| | | |
|---|---|---|
| North Chicago City Railway Company | 1,773 | shares |
| Chicago West Division Railway Company | 4,409 | " |
| West Chicago Street Railroad Company | 80,087.50 | " |
| North Chicago Street Railroad Company | 49,568.20 | " |
| Chicago Union Traction Company, preferred | 109,158 | " |
| Chicago Union Traction Company, common | 158,244 | " |

Following these findings the vital provisions of the order are in paragraphs, 1, 3, 4, 5, and 7 thereof, reading as follows:

1. The receivers heretofore appointed in this cause shall forthwith execute and deliver unto Chicago Railways Company, in form to be approved by this court, a lease of all of the lines of street railway operated by the receivers of

Chicago Union Traction Company on February 1, 1907, with all the plant and equipment at said last-mentioned date or at the present time in use on or in connection with the said lines of street railway, whereby the Chicago Railways Company shall be vested with the lawful possession of all of said lines of street railway together with all the said plant and equipment, to have and to hold the same from the day of the date hereof until the 2d day of February, 1927, unless and until prior to said date said lines of street railway, plant, and equipment shall be sold pursuant to decrees of this court, or final decrees in said causes are entered without sale, and in case of such sale until delivery of possession thereof to the purchaser thereof pursuant to a decree or decrees of this court confirming such sale, upon the terms, covenants, and stipulations to be contained in said lease as hereinafter provided. And it is further ordered, adjudged and decreed that upon the delivery to and acceptance of said lines of railway and plant and equipment by said Chicago Railways Company, the said Chicago Railways Company shall be and is hereby authorized, empowered, and directed to comply with each and every of the provisions of the said ordinance of the city of Chicago passed February 11, 1907, with respect to the operation, maintenance, extensions, reconstruction, re-equipment, and improvement of said railways, holding the receivers appointed in each of the above-entitled causes harmless from any liability arising therefrom, and to do and perform all the things required of said Railways Company by said ordinance, including the making from the receipts of the demised property all the deposits and payments required by the provisions of the said ordinance, in consideration of which, among other things, said Railways Company shall be entitled to collect and receive the tolls and income of the demised property; and said Chicago Railways Company is hereby further empowered to transfer to the city or its licensee the lawful possession of said street railways and property as provided in said ordinance, together with all the rights and powers of the said Chicago Railways Company in or connected with said street railways in property in accordance with the provisions of the said ordinance in that behalf. And the receivers heretofore appointed in each of the above-entitled suits are hereby ordered to surrender and deliver to the Chicago Railways Company immediately upon the execution of the said lease the possession of all of the said lines of street railway, plant and equipment embraced in the said lease, whereupon said company shall be vested with the lawful possession of all the lines of street railway operated by the receivers of the Chicago Union Traction Company, on February 1, 1907, with all the plant and equipment in use on or in connection with said lines at the time of said acceptance, with power and authority to comply with the provisions of said ordinance with respect to the operation, maintenance, extension, reconstruction, re-equipment, and improvement of said railways, and to make from the receipts thereof all the deposits and payments required by the provisions of said ordinance to be made from such receipts, and with power to transfer to the city, or its licensee, all such possession, rights, and powers in accordance with the provisions of said ordinance.

3. And it is further ordered, adjudged, and decreed that, for the cost (so certified) of such construction, reconstruction, equipment, re-equipment, extensions, and additions, including the percentages under section 7 of said ordinance specified, whether or not the same be represented by bonds or obligations held, negotiated or sold by said Chicago Railways Company or in accordance with the provisions of said section 7 of said ordinance, a lien in accordance with the provisions of said ordinance shall exist upon all of the said property constituting the said system of street railways embraced in said lease in favor of the said Chicago Railways Company, its successors and assigns, which lien, as against all parties to this cause and all parties claiming under them, or any of them, or under any order or decree hereafter made herein, and any and all other persons having or claiming to have any interest or benefit under the said ordinance, shall at all times be deemed and recognized to be a first lien upon the said entire street railway system, subject however to the provisions of said ordinance.

4. And it is further ordered, adjudged, and decreed that the said Chicago Railways Company, for the purpose of securing payment of moneys borrowed by it to defray the said cost of such construction, reconstruction, equipment,

re-equipment, extensions, and additions to said system of street railways, required by said ordinance passed February 11, 1907, including the percentages in section 7 of said ordinance mentioned, to an amount not exceeding the amount certified by the said board of supervising engineers in accordance with the provisions of section 7, may issue its bonds or obligations, bearing interest at a rate not exceeding 5 per cent. per annum, payable semiannually on the 1st days of February and August in each year, maturing not earlier than 20 years after the passage of the said ordinance, in denominations not less than $500 each, redeemable at par and accrued interest after published notice on any day appointed for the payment of interest, and may secure the payment of such bonds or obligations by a mortgage or deed of trust executed in compliance with the provisions of the said ordinance, and approved as therein provided, which mortgage shall constitute a first lien upon the said entire street railway system to the amount of the said bonds or obligations issued in accordance with the provisions of section 7 of said ordinance, and in addition thereto to the amount certified by said board of supervising engineers (including said percentages) which shall not be represented by bonds and obligations as aforesaid, for which last-mentioned amount a lien in favor of the company is created by said ordinance, and which mortgage as against all parties to this cause and any and all other persons having or claiming to have any interest or benefit under the said ordinance shall at all times be deemed and recognized to be a first lien subject to the provisions of the ordinance upon the entire street railway system, plant, and equipment so leased unto said Chicago Railways Company, superior to the liens of all and every the existing mortgages on said system of street railways, or any part thereof, and to all and every the liens now existing upon the said system of street railways, or any part thereof in favor of any party to any of the above-entitled suits.

5. And it is further ordered, adjudged, and decreed that, in further consideration of the covenants and agreements contained in said lease, the said Chicago Railways Company shall account for and settle with the city of Chicago with respect to the tolls and income of the demised premises in accordance with the provisions of the said ordinance.

And it is further ordered, adjudged, and decreed that out of that portion of the tolls, receipts, and income of the demised premises remaining after providing for the payment of the first mortgage bonds of the Railways Company issued as above authorized, and after making the deposits and payments required by the ordinance, which the Railways Company is entitled under the provisions of said ordinance to retain, said Railways Company shall, from time to time when and as required by the court, account for and pay over any portions of said remaining income to which it may be adjudged that any party to either of the above-entitled causes is entitled.

7. And it is further ordered, adjudged and decreed that all parties to this cause and all parties claiming under them, or any of them, or any order or decree heretofore or hereafter made herein, their respective agents, attorneys, or other representatives, are hereby enjoined and restrained from in any wise interfering with the possession by the Chicago Railways Company of the said system of street railways and appurtenant property under said lease and pursuant to this order, or with the doing by said Chicago Railways Company of any of the acts hereinbefore referred to and authorized.

The court retains the power and jurisdiction to in this cause fix, determine and adjudicate the rights, liens, claims and interests of any person or persons, corporation or corporations, in and to said railways and property; provided, however, that the lien hereinbefore authorized to be created with respect to moneys borrowed or expended for the purpose of the rehabilitation of the said properties shall at all times be recognized as prior and paramount, subject, however, to the provisions of said ordinance, to any rights or claims of any persons who now are or hereafter may become parties to this cause, and any persons claiming under any such party or under order or decree heretofore or hereafter entered herein, upon all of the property constituting any portion of the said system of street railways and appurtenant property, and any sale of the said property hereafter made shall always be subject to such prior and paramount lien of the said mortgage.

This order and all rights taken thereunder are without prejudice to the statutory lien reserved in car trust agreements under the orders of August 3, 1904, and January 8 and 30, 1907.

Frank H. McCulloch, Horace Kent Tenney, Frank H. Scott, Julien T. Davies, A. M. Breitler, John R. Montgomery, Charles H..Aldrich, Henry Crawford, and James Hamilton Lewis, for appellants.

W. W. Gurley, George W. Wickersham, Frank Hagerman, and John M. Harlan, for appellee.

Before BREWER, Circuit Justice, and BAKER and SEAMAN, Circuit Judges.

BREWER, Circuit Justice. Public interests, the necessity of a unity of operation and control of the street car system in North and West Chicago, are the stress of the argument in favor of the order of the Circuit Court. Section 38 of the ordinance, as well as the statements of counsel, make against this contention, inasmuch as there is by that section given to the company that has the ownership of the south side property the right to proceed into the north and west side, and thus establish a unified system for the entire city. It becomes, therefore, more a question of private rights.

I think I may say for all of us—of course, I speak with a little hesitation in view of my limited knowledge of the conditions—that the ordinance tendered by the city was reasonable and fair, and that as a business proposition it would have been wise for all parties to accept it; but the court does not make contracts for parties. It deals with legal rights, as the parties have, by contract, made them, and although it may believe that a party insisting upon those rights is probably, or even certainly, bound to suffer loss, yet while he insists it must protect him in his insistence. There is no wide discretion vested in the chancellor which permits him to disturb contract rights—rights of property. This question has been before the Supreme Court more than once, and as was said in the case of Kneeland v. American Loan Co., 136 U. S. 97, 10 Sup. Ct. 953 (34 L. Ed. 379):

"The appointment of a receiver vests in the court no absolute control over the property, and no general authority to displace vested contract liens. Because in a few specified and limited cases this court has declared that unsecured claims were entitled to priority over mortgage debts, an idea seems to have obtained that a court appointing a receiver acquires power to give such preference to any general and unsecured claims. It has been assumed that a court appointing a receiver could rightfully burden the mortgaged property for the payment of any unsecured indebtedness. Indeed, we are advised that some courts have made the appointment of a receiver conditional upon the payment of all unsecured indebtedness in preference to the mortgage liens sought to be enforced. Can anything be conceived which more thoroughly destroys the sacredness of contract obligations? One holding a mortgage debt upon a railroad has the same right to demand and expect of the court respect for his vested and contracted priority as the holder of a mortgage on a farm or lot. So, when a court appoints a receiver of railroad property, it has no right to make that receivership conditional on the payment of other than those few unsecured claims, which, by the rulings of this court, have been declared to have an equitable priority. No one is bound to sell to a railroad company or to work for it, and whoever has dealings with a company whose property is mortgaged must be assumed to have dealt with it on the faith of its personal responsibility, and not in expectation of subse-

quently displacing the priority of the mortgage liens. It is the exception and not the rule that such priority of liens can be displaced. We emphasize this fact of the sacredness of, contract liens, for the reason that there seems to be growing an idea that the chancellor, in the exercise of his equitable powers, has unlimited discretion in this matter of the displacement of vested liens."

Now,. undoubtedly, it is true that when a receiver is appointed of railroad properties, street car or steam railroad, there is power vested in the court appointing to, under certain conditions, authorize the issue of receiver's certificates and those certificates are sometimes given priority over mortgage liens. But, notwithstanding I am forced to admit there have been some exceptions in the action of trial courts, the rule in the Supreme Court, emphasized in this case, is that no serious disturbance can be made of contract obligations or priority. The amount of receiver's certificates is generally small in comparison with the value of the property concerned. In this case it appears that $822,000 of receiver's certificates are outstanding. Probably the condition required that something should be done to keep the plant in working, serviceable condition, and that amount is, relative to the value of the entire system, not large.

But the case before us involves something more. We cannot rest it upon the theory of de minimis, a trifling matter. We have studied, each one of us separately, the plan of reorganization, the order of the court, and the ordinance, and it seems to each of us that it interferes most materially, substantially, to the destruction of vested contract liens. There are some $13,000,000 mortgage bonds—I may not be right as to the figures, but there is at least that amount—secured by definite contracts upon specific property. This order does not provide for displacing, slightly, the priority by the issue of a minor sum in receiver's certificates, but it takes the whole body of these contract obligations and puts them below a mortgage of from $12,000,000 to $15,000,000. It may be wise, and I think we agree that it is, that this bond issue be made and that this railway system be unified and improved, as contemplated in the ordinance; but it is not for the court to assume the power to compel, because it believes that it is wise and good business. Parties have vested rights. Let me put the case this way :.

Supposing the Legislature of Illinois had passed an act providing for the displacement of these mortgage liens and giving in place thereof only security upon the property as it shall be perfected, and then subsequently to the $12,000,000 mortgage. Would the court, if the validity of that action of the Legislature were before it, say that it was within the scope of legislative power thus to disturb priority of liens, and would the court sustain the act upon the theory that it believed the Legislature was acting wisely, that it was a good business solution of a difficult situation? Parties have inherent and sacred rights of property which cannot be disturbed, except under the law of eminent domain, or some provision of that kind, and then compensation is made. It does not lie in the power of the Legislature, or in the power of the courts, to materially affect the liens, either in the property upon which they rest, or their priority. Of course, there can be no question about this. It appears from the discussion that this whole scheme is

predicated upon the fact that the physical condition of the city railway system on the north and west sides is poor; that it needs improvement; that the interests there are conflicting; that franchises are expiring, or have expired; rights are mingled and perhaps confused; and the order proceeds upon the theory that it is best for all that these separate liens and separate corporate interests shall be merged in one corporation, whose duty it shall be to borrow money enough to put the physical property in good condition. Now, that may be a wise business proposition, and if the court had power to take hold of these things and do for the people, who are mortgage bondholders, that which it thinks best for them, we might have no hesitation in sustaining this; but every man in this country decides questions in respect to his own property for himself. Life, liberty, and the pursuit of happiness are guaranteed to each one. They are inalienable rights, and although a man misjudges what is best for him, that fact gives no court the right to compel him to act otherwise.

In this connection, one matter deserves notice, and that is that the scheme implies the destruction of much of the property as it now exists and the replacing it with structures adapted to new conditions. In that respect it differs from many issues of receiver's certificates, especially those of large amounts, which have been merely for the purpose of adding something new to existing property. This rehabilitating mortgage, and it can certainly stand in no higher position than receiver's certificates, is not simply to raise money for additional lines, extension of the system, but largely for the replacement of the present structures with something new and better. In other words, to no small extent the property mortgaged is destroyed, and new property put in its place, subject to a prior lien.

This rehabilitating mortgage is not in terms limited in amount. It is limited, however, by the fact that the moneys to be borrowed are to be expended in the improvement of the unified system, and it is a fact, too, as stated by counsel, that a committee representing the city, a board of engineers I think he called it, has jurisdiction over the amount and character of the improvements. Now, what does that mean? It means that those improvements are not made according to the judgment of the bondholders. It means that they are not made according to the judgment of the present corporate owners of the property, either stockholders or bondholders, but that a body outside of them, not appointed by them, is charged with the responsibility of determining what shall be done in the way of improvements. Now, I have no doubt, as was said by counsel, that the committee selected by the city of Chicago will deal fairly and honestly, and, perhaps, they being civil engineers and experts in their lines of business, with far better judgment than the trustees of these mortgages, or the officers of the corporations. But, at the same time, no man is compelled to turn his property over to the control and management of another. At least, the courts are not authorized, except in the case of insanity or imbecility, to take one person's property, and put it into some one else's care to determine what is best for it. These voluntary reorganizations, which are going on all over the country do involve, sometimes, moral

pressure upon certain interests to concede something in the hope that they will get a larger benefit from the reorganization, but the action is voluntary. They are the acts of the parties themselves. They are making new contracts. They are entering into new relationship with one another. The individual is making the contract, and not the court for him.

In reference to the superintendency by this committee, it is not provided, as I think, that that superintendence shall be under judicial control. The Circuit Court, in making this order, does not reserve to itself the power to supervise the action of the board of engineers to whom the character and amount of the improvements are entrusted. The full control of those properties in the rehabilitation is given to a committee not selected by the present owners, and not within judicial control.

While the city names one engineer, the company a second—that is, the company that takes these properties—a gentleman, Mr. Arnold, is selected and appointed as the third member. Yet he holds life by the same tenure that the rest of us do and may not live long, and who the city will appoint in his place cannot be foreshadowed. At any rate, with reference to the personnel, while I do not mean to cast any reflection upon this man, or suggest the probability of the city selecting an unfit man, it is enough that it is a selection not made by the owners of the property. As I said a while ago, it is conceded that the amount of this mortgage—the rehabilitating mortgage—is uncertain. It is limited in two ways: One, that the proceeds must be used for improvements, and another that the improvements are subject to the decision and judgment of this committee. But it is, as shown in the plan of reorganization, something uncertain, and no man can tell certainly what will be. As the amount needed for this purpose cannot be fixed with exactness, it is impossible to fix a limitation as to the authorized issue; and hence such amount must be left without limitation except as stated above.

We have hastened in our examination, because a week from to-day is fixed as the time for the expiration of the option. Thinking that perhaps during the week the parties may come to some agreement with reference to the disposition which should be made of this property, and believing, as we do, that the system proposed has its great advantages, we have, without stopping to write out in full our views upon this or any other question, announced this decision orally. At the same time we reserve the right, each one of us, to put in writing such further expression as may seem to him desirable.

The order will be that the order made by the Circuit Court is set aside, and the case remanded for further proceedings.